LARRY J. HRDLICKA AND FRANCES HRDLICKA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hrdlicka v. Commissioner
Docket No. 7320-84.
United States Tax Court
T.C. Memo 1985-403; 1985 Tax Ct. Memo LEXIS 236; 50 T.C.M. (CCH) 675; T.C.M. (RIA) 85403; August 7, 1985. Ted M. Riseling and Thomas J. St. Ville, for the petitioners. Bruce K. Meneely, for the respondent. GOFFE
MEMORANDUM FINDINGS *238 OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' income tax in the amounts of $8,079.44, $9,079, and $7,809 for the taxable years 1978, 1979, and 1980, respectively. After a concession by petitioners, the only issue for decision is whether petitioners operated their cattle ranch as an "activity * * * not engaged in for profit" within the meaning of section 183(a). [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. Larry J. and Frances Hrdlicka (petitioners) are married and timely filed joint Federal income tax returns for the taxable years 1978, 1979, and 1980 with the Internal Revenue Service Center at Austin, Texas. Petitioners resided in Claremore, Oklahoma, at the time the petition in this case was filed. Petitioner Larry J. Hrdlicka [2] (hereinafter referred to as Dr. Hrdlicka) was raised and educated in Oklahoma. He is a surgeon who completed his medical *239 education in 1969 and opened his practice in Claremore, Oklahoma, in that same year. Prior to 1970, Dr. Hrdlicka had no direct contact with the cattle business, yet he had a life-long dream of living on a farm and raising cattle. He discussed the economic opportunities of the cattle business with his father-in-law, an experienced cattleman who operated a John Deere farm implement business. Shortly after these discussions, Dr. Hrdlicka purchased 100 acres of land complete with farmhouse and outbuildings. The land was not particularly well suited for a cattle operation because of poor vegetation. Although Dr. Hrdlicka knew of the poor quality of the land, he had few choices as to the location of the ranch since his position on the staff of Claremore Health Center required him to live within one mile of Claremore. *240 The ranch does not contain any recreational facilities. The creek running on the west side of the property is polluted and unusable. There is no game suitable for hunting on the property. The Hrdlickas named the ranch "Farm of the Pines" and began operations in 1970. In November 1970, Dr. Hrdlicka consulted with the Rogers County Soil and Water Conservation District and Oklahoma State University Extension Center for the purpose of running soil tests and developing proper vegetation. Using their recommendations, he constructed a dual watering system permitting a more efficient grazing pattern for the cattle. The Soil and Water Conservation Service also provided assistance in implementing a conservation plan. Special grasses were planted, scales for weighing the cattle were provided, and special cattle feeds were recommended. Dr. Hrdlicka was on the mailing list of the Oklahoma State University Extension Service and consulted with the Service concerning vegetation, soil testing, and fertilizing the pasture land. He occasionally leased farm equipment made available by the Service to local ranchers. Following the start-up of petitioners' cattle operation, his contacts with *241 the Service have diminished. Dr. Hrdlicka, seeking a purebred animal for breeding purposes, consulted with Carlton Corbin, Jr., a Kansas cattle dealer. After these discussions, Dr. Hrdlicka chose the Angus breed, planning to raise purebred Angus calves and to sell them through Mr. Corbin's annual consignment sales. Dr. Hrdlicka began the cattle operation in March of 1971 with an initial purchase of eight registered Angus cows and one registered Angus Bull. He paid $2,675 for these animals. In 1972, Dr. Hrdlicka sold this herd because it was not the quality that Mr. Corbin wanted to sell at his consignment sales. Dr. Hrdlicka thereupon purchased from Mr. Corbin another Angus herd for approximately $7,500. This herd consisted of ten older cows and seven calves. On March 7, 1973, Dr. Hrdlicka purchased a commercial grade Hereford herd consisting of 67 cows and two bulls from his neighbor, Mrs. Mildred Daniels. He paid approximately $14,500 for these animals. He also leased an additional 160 acres of land from Mrs. Daniels to accommodate the increased size of the herd. He planned to cross-breed the Herefords with his Angus to create a mixed breed known as "Black Baldies." *242 In early 1975, Dr. Hrdlicka lost the lease on the 160 acres. As a result, in May 1975 he was forced to sell 54 head of the cattle for $5,985. He retained 15 cows and a few calves for continued use in the cattle operations. In 1971, Dr. Hrdlicka hired his 67-year-old uncle, J. D. Abbott, to help with miscellaneous ranch chores. Mr. Abbott built troughs, drove and maintained the tractor, and ran errands. Mr. Abbott and Dr. Hrdlicka agreed that Mr. Abbott's compensation would be the maximum amount he was allowed to receive under Social Security without incurring a penalty. Dr. Hrdlicka hired his three children to help with the chores. Laura Hrdlicka, the oldest, was born in 1963. She was in charge of policing the farm grounds and helping get loose cattle back inside fences. Kyle Hrdlicka, born in 1965, performed chores that included hauling hay, driving farm vehicles, grading the lot, helping with veterinary chores, and constructing fences. Leslie, three years younger than Kyle, made certain that the cattle were watered. Although Dr. Hrdlicka hired his uncle and children to work at the ranch, he performed many functions himself. He bought and sold the cattle. He purchased *243 and handled the cattle feed. He wormed and vaccinated the cattle and castrated the bulls. During the week, he worked on the ranch before and after his shift at the hospital. He spent his weekends working on the ranch as well. On the average, Dr. Hrdlicka spent one hour per day on weekdays and four hours per day on weekends working on the ranch. Dr. Hrdlicka operated a "cow-calf" cattle operation during the taxable years 1971 through 1983, not a "stocker" cattle operation. In a stocker operation a rancher buys the cattle, feeds them for a period of time and then sells them. In a cow-calf operation the rancher maintains a herd of mother cows used for breeding calves that are sold. The "start-up" period required for a cow-calf operation, i.e., the time an operation must be run before generating a profit, is approximately 5 to 7 years. The Enterprise Budget System published by the Oklahoma State University Department of Agricultural Engineering projected costs and economic returns for a "cow-calf" operation such as the one operated by Dr. Hrdlicka. The Enterprise Budget System projected increasing profit margins for this type of operation for the years 1978, 1979, and 1980. *244 Dr. Hrdlicka sold the calves he raised on the ranch when they reached a weight of between 550 and 600 pounds. Approximately the first 450 pounds of a calf's weight is attributable to the sustenance provided by the mother cow. When the calf weighs approximately 450 pounds, outside food sources must be used for the calf to gain additional weight. Cattlemen with cow-calf operations usually sell their calves at the 450 pound weight. They only sell at a greater weight when there is a good wheat or grass source available. If such a source is unavailable, the added expense of getting supplemental grain or forage reduces the profitability of raising cattle to the higher weight. Dr. Hrdlicka maintained the books and records with respect to the ranch operations. These records were maintained separately from the Hrdlicka's other records. Records were kept on each cow, showing calving dates, offspring gender, and medical history. He maintained a separate column in his cash disbursements journal in which he itemized cash expenditures relating to the ranch operation. He routinely supplied the cash disbursements journal to his accountant and it was used in the preparation of the income *245 tax returns. Petitioners reported the ranch expenses on their joint income tax returns for the years in issue as follows: Expense
1978
1979
1980
labor/contract labor
$ 3,601.50
$ 3,315.00
$ 8,327.00
repairs/maintenance
1,383.74
1,047.48
721.00
rent of farm/pasture
550.00
540.00
feed
2,705.26
1,909.69
4,405.00
fertilizer
702.05
592.50
supplies
736.28
716.70
226.00
veterinarian
121.50
143.00
42.00
gasoline
1,309.75
1,932.64
1,360.00
taxes
1,583.61
241.45
311.00
insurance
1,510.40
1,708.65
424.00
miscellaneous
29.00
utilities
739.20
675.69
821.00
trucking/freight
50.00
telephone
383.13
435.15
116.00
interest
3,905.78
2,146.22
1,500.00
commission
42.00
truck repair
1,079.00
machine hire
140.00
TOTAL
$18,724.20
$15,464.17
$20,041.00
Petitioners' gross farm income, expenses, depreciation, and net farm loss for their cattle operation for the taxable years 1971 through 1983 were as follows: Gross Income
Gross farm
Farm
Net farm
Before Deducting
Year
Income
Expense
Depreciation
Loss
Farm Loss
1971
$6,061
1,034
$ ( 7,365)
$43,423.77
1972
* $2,511
10,587
3,164
(11,240)
46,132.99
1973
2,915
20,728
5,480
(23,293)
50,321.60
1974
* 4,348
* 20,599
* 5,353
(21,604)
61,269.38
1975
* 5,632
18,160
2,309
(14,837)
52,902.99
1976
2,199
19,778
1,050
(18,629)
57,484.35
1977
775
22,399
944
(22,568)
74,499.37
1978
* 3,435
18,724
3,487
(18,776)
76,303.88
1979
15,464
3,242
(18,706)
84,066.00
1980
8,410
20,041
2,817
(14,448)
97,997.00
1981
1,363
16,290
947
(15,874)
112,512.00
1982
2,770
15,512
880
(13,622)
136,460.00
1983
4,080
15,800
766
(12,486)
165,076.00
*246 The Commissioner determined that petitioners' cattle operation was not an activity engaged in for profit within the purview of section 183 and, therefore, determined deficiencies for the taxable years 1978, 1979, and 1980 in the amounts of $8,079.44, $9,079, and $7,809, respectively. OPINION The issue for decision is whether the operation of petitioners' farm was an "activity * * * not engaged in for profit" within the meaning of section 183. [3] Section 183(a) provides that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction [for expenses or losses] attributable to such activity shall be allowed" except as provided in section 183(b). Section 183(b)(1) permits deductions only for items that are allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) permits deductions for items that would be allowable if the activity were engaged in for profit, but only to the extent that *247 gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). An "activity not engaged in for profit" is defined as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). *248 If for any 2 of 5 consecutive taxable years the gross income derived from the activity exceeds the deductions attributable to such activity, section 183(d) provides a presumption that the activity is engaged in for profit. Petitioners' ranch has never produced a profit; therefore, that presumption does not apply in this case. The test for deciding whether a taxpayer is carrying on a trade or business or holds property for the production of income, so that his expenses are deductible under sections 162 or 212, is whether the individual's primary purpose and intention in engaging in the activity is to make a profit. Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Although profit need not be the sole motive in undertaking or continuing an activity, it must be the predominant motive. Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). The expectation of profit need not be reasonable; it is sufficient *249 if there is an "actual and honest profit objective." Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Lemmen v. Commissioner,supra at 1340; Golanty v. Commissioner,supra at 425-426. Petitioners have the burden of proving that they had the requisite profit objective. Rule 142(a); Allen v. Commissioner,supra at 34; Benz v. Commissioner,63 T.C. 375, 382 (1974). In deciding whether petitioners intended to make a profit, we must look to objective standards and consider all the surrounding facts and circumstances of the case. Sec. 1.183-2(a), Income Tax Regs.; Faulconer v. Commissioner,748 F.2d 890, 894 (4th Cir. 1984); Churchman v. Commissioner,68 T.C. 696, 701 (1977). The regulations provide nine factors to consider when deciding whether an activity has been entered into for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer *250 in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner,supra at 644. No one factor determines the taxpayer's intention to make a profit, and certain factors may be given more weight than others because they are more meaningful when applied to the evidence in a particular case. Sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,supra at 426. [4]
After an analysis of these factors, we find that petitioners did not enter into the cattle raising activity with the objective of making a profit for the taxable years in issue. (1) Manner in which the taxpayer carries *251 on the activity
We first consider the manner in which petitioners carried on the activity. Petitioners did not approach the cattle operation in a haphazard manner. Throughout the years of operation, Dr. Hrdlicka kept records on each animal.He separated ranch expenses from personal expenses in the cash disbursements journal. The information was given to petitioners' accountant and reported on their joint income tax returns. As a result, petitioners were certainly aware of the large losses being generated and the tax consequences thereof. Although petitioners initially consulted with Dr. Hrdlicka's father-in-law about the future profitability of such an operation and received assistance from the Oklahoma State University Extension Service and the Rogers County Soil and Water Conservation District, the level of assistance declined after the first couple of years of operation. The Enterprise Budget System promulgated by the Oklahoma State University Extension Service and available to petitioners projected increasing profit margins for cow-calf operations during the years in issue while petitioners continued to suffer losses. Petitioners have not shown that they made any serious *252 effort to reverse the series of losses their cattle operation was suffering. Petitioners' witness, Mr. Bill Burton, a specialist in farm management from Oklahoma State University, testified that until a calf weighs 450 pounds, a calf gets most of its weight from the sustenance it receives from its mother. Mr. Burton stated that ranchers usually sell at the 450 pound weight and only sell at a greater weight when they have a wheat pasture or a very good source of grass source available. Without such food sources, it is difficult and expensive to put the extra weight on the calves. Although the "Farm of the Pines" had poor vegetation, Dr. Hrdlicka raised his calves to the 550 to 600 pound level before selling them. Holding the calves until they reached the higher weight is inconsistent with a profit motive in running the cow-calf operation. (2) The expertise of the taxpayer or his advisors
Dr. Hrdlicka had no experience in raising cattle prior to purchasing the "Farm of the Pines." Although he consulted with advisors before and during the initial phase of his cattle operation, there is no evidence showing that he sought any expert advice during the course of operations. *253 Neither have petitioners shown that they employed any specialized workers to help manage the ranch. Instead, petitioners hired Dr. Hrdlicka's 67-year-old uncle and three children. While they performed necessary ranch chores, they could not provide the type of expertise necessary to make the ranch profitable. The failure to consult with experts during the years in issue is another indication that petitioners lacked the necessary intent to make a profit from their cattle operation. (3) The time and effort expended by the taxpayer in carrying on the activity
Dr. Hrdlicka spent approximately 13 hours per week working on the ranch. While the work required physical labor, he did not reduce the amount of time he spent at his medical practice. (4) Expectation that assets used in activity may appreciate in value
Petitioners claimed significant depreciation deductions with respect to the "Farm of the Pines" for every year of operation, but presented no evidence concerning their expectation that any of the assets used in the cattle raising activity were appreciating in value. Rule 142(a). (5) The success of the taxpayer in carrying on other similar or dissimilar *254 activities
As to the fifth factor outlined in the regulations, petitioners concede they have not engaged in any similar activities. (6) The taxpayer's history of income or losses with respect to the activity
Petitioners' history of losses with respect to this endeavor also indicates a lack of profit motive. Petitioners' explanation for the unbroken string of losses is that they changed their activities from a "stocker" operation to a "cow-calf" operation in 1975. Because of this change and the subsequent 5 to 7 year start-up period, petitioners insist that this string of losses is not unusual. While the regulations do consider losses incurred during the start-up phase of a business, the facts do not support petitioners' argument. It is clear from the record in this case that petitioners acquired a herd for breeding purposes from the beginning of the operation. Since 1971, there had been cows and bulls on the ranch. In 1972, Dr. Hrdlicka planned to cross-breed Angus and Herefords to get "Black-Baldies." If, as petitioners maintain, they were operating a stocker operation, breeding would be unnecessary. Only in a cow-calf operation does breeding represent a significant *255 part of the operation. (7) The amount of occasional profits, if any, which are earned
Petitioners' cattle operations never showed a profit from 1971 to 1983. The continuation of their operations in light of consistent losses is another indication that petitioners were not engaged in the activity with the intent to make a profit. (8) The financial status of the taxpayer
Although we recognize that Dr. Hrdlicka was not earning substantial amounts of income when he purchased the "Farm of the Pines" and began operations, he did have substantial income during the taxable years in issue. During the taxable years 1978, 1979, and 1980, petitioners' gross income from other sources was $76,303.88, $84,066, and $97,997, respectively. As Dr. Hrdlicka's personal income from other sources increased, the tax benefits of the losses generated by the ranch rose also. (9) Elements of personal pleasure or recreation
The final factor to be considered is the petitioners' personal pleasure or recreation derived from the cattle operations. While recognizing that Dr. Hrdlicka worked approximately 13 hours per week on the ranch and the ranch had no swimming or hunting *256 facilities, the petitioners derived a substantial degree of satisfaction from operating the "Farm of the Pines." By living on the ranch, Dr. Hrdlicka was able to raise his children in a rural setting and still practice full-time as a surgeon. In conclusion, while no one of the factors considered is conclusive, Golanty v. Commisioner,supra, the final analysis of all factors leads to the inescapable conclusion that petitioners' cattle operation during the taxable years in issue was not an activity entered into for profit. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner Frances Hrdlicka is a party herein solely as the result of filing a joint Federal income tax return with petitioner Larry J. Hrdlicka for the taxable years in issue. As she was not personally involved in any of the relevant events, we will, for purposes of simplicity, refer only to petitioner Larry J. Hrdlicka when discussing this couple's tax liability.↩
*. These amounts were taken from respondent's proposed findings of fact, to which petitioners did not object. We accept these figures to be correct although we are unable to verify them from the record before us.↩
3. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. (d) Presumption.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.↩
4. See also Frazier v. Commissioner,T.C. Memo. 1985-61; Zuckerman v. Commissioner,T.C. Memo. 1984-192↩.